**L.B. FOSTER COMPANY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**Nos. 01–01–00299–CR, 01–01–00300–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

March 27, 2003.

Rehearing Overruled June 13, 2003.

Greg Waller, Andrews & Kurth L.L.P., Thomas A. Hagemann, Gardere, Wynne, Sewell, L.L.P., Houston, TX, for Appellant.

Charles A. Rosenthal, Jr., District Attorney–Harris County, Scott A. Durfee, Assistant District Attorney, Houston, TX, for State.

Panel consists of Justices TAFT, KEYES, and HIGLEY.

## OPINION

LAURA CARTER HIGLEY, Justice.

In two separate indictments, appellant, L.B. Foster Company, was charged with the offenses of illegal disposal of used oil [1] and illegal disposal of a hazardous waste.[2] *See* TEX. WATER CODE ANN. §§ 7.162, 7.176 (Vernon 2000). A jury found L.B. Foster guilty as charged in both indictments and assessed punishment at $20,000 for the used oil offense and $150,000 for the hazardous waste offense.

In 11 issues, L.B. Foster contends that the evidence was legally and factually insufficient to support either conviction, challenges omissions from and inclusions in the jury charges, and complains that the indictment for the used oil charge was jurisdictionally defective.

We reverse and render a judgment of acquittal in the hazardous waste case and affirm the judgment in the used oil case.

## FACTUAL BACKGROUND

On December 30, 1997, Houston Police Officer R.T. Hatcher and his partner, M.W. Sallee, conducted a follow-up investigation to determine whether the Burlington Northern Railway had addressed previously identified municipal code violations along the railroad's right-of-way, which

---

1. Trial court cause number 850910; appellate cause number 01–01–00300–CR.

2. Trial court cause number 850911; appellate cause number 01–01–00299–CR.

bordered a public Houston street. From the street, Officer Hatcher noticed a rail spur that ran to what he thought was a rail yard approximately 200 yards away. Officer Hatcher observed a pile of wood cross-ties and metal track rails in the yard. Believing that the pile of debris belonged to the railroad, which had been warned to clean-up the area, Officer Hatcher and his partner drove to the property he had observed from the street. Once on the property, Officer Hatcher noticed what he termed as "serious violations of the municipal code."[3] Specifically, Officer Hatcher observed high grass, "jumbled piles of material," derelict vehicles, and stagnant water, which provide breeding areas for rodents and mosquitos.

After observing the code violations, Officer Hatcher and his partner drove toward the office buildings on the property. Officer Hatcher discovered that the property was not a rail yard; rather, it was the property of L.B. Foster. As they were driving on the property, they met Bryan Causey, an employee of L.B. Foster. Causey identified himself as "the man in charge of the property." When Officer Hatcher asked him about the pile of cross-ties and rail lines, Causey explained that L.B. Foster cut rail for the railroads.

Located on L.B. Foster's property were numerous metal buildings of various shapes and sizes. Officer Hatcher noticed what appeared to be oil on the ground under "hydraulic roller machines" located outside of the buildings. Officer Hatcher saw that the soil under the machines appeared blackened, and, that puddles of water, which had accumulated from a recent rain, appeared to contain oil. On the bottom of a few of the metal buildings, Officer Hatcher could see "oily material." It ap-

peared to Officer Hatcher that oil had run in or out of the buildings.

Officer Hatcher issued a warning notice to Causey listing six violations of municipal ordinances. Illegal dumping of oil was not listed in the notice. Officer Hatcher also gave Causey a document entitled "Common Violations of City of Houston Municipal Ordinance." The preprinted document listed 57 possible municipal code violations. Of these possible violations, Officer Hatcher circled 21 items, including the following: "Permit the deposit of offensive matter hazardous to public health, i.e., used motor oil." Officer Hatcher also verbally mentioned the oil contamination to Causey. Officer Hatcher specifically pointed out the staining on the bottom of the buildings. Causey acknowledged that he was aware of the oil problem and told Officer Hatcher, "I'll take care of it." Officer Hatcher indicated to Causey that he would return on February 5, 1998, to determine whether the noted violations had been corrected.

When he returned to L.B. Foster's property on February 17, 1998, Officer Hatcher found that none of the cited violations had been corrected. L.B. Foster had taken no action to clean-up the oil contamination that Officer Hatcher had cited on his previous visit. Officers Hatcher and Sallee took several photographs related to the oil contamination and informed Causey they would return the next day with other police officers.

At trial, in explaining various pictures, Officer Hatcher commented on the following: several buckets of black sludge tipped over on the ground near a fueling station; what appeared to be oil inside the sewer and stained soil with an oily substance flowing toward the storm drain, and dark

3. Unless otherwise indicated, all quotations in the factual background section are taken from the respective witnesses's testimony at trial.

staining on the ground around a pick-up truck and an oil bucket of the type used to change oil. With regard to the oil bucket, Officer Hatcher testified that it "looked like somebody changed the oil on a vehicle, threw the oil here and here on the ground."

The following day, on February 18, 1998, Officer Hatcher and his partner returned to L.B. Foster's property with Officer Stephen Dicker, who worked for the Houston Police Department's environmental crimes unit. Also present were two fire marshal inspectors. The police officers discussed the violations with Causey and other L.B. Foster representatives. The police officers and company officials also toured the property. Officers Hatcher and Sallee issued 19 citations to Causey for municipal code violations. None of the citations were for improper disposal of used oil or hazardous waste.

The officers also took additional photographs of the oil contamination on February 18. Generally, the photographs show dark staining under hydraulicly-operated machines and pipe storage racks, black substance on the walls of the buildings, and oil-like stains on the ground, grass, and floors of the facility. Officer Dicker observed pistons and hydraulic hoses on the machinery actively leaking oil-like substances onto the ground in all operating areas of the property, and buckets of hydrocarbon fluids being stored without being sealed. He observed that the buckets had either leaked or spilled. He also observed "a lot of" stained soil underneath the areas where hoses had been disconnected and a pool of standing hydrocarbon liquid in the area.

Officer Dicker discussed with L.B. Foster officials the cause of the oil contamination, namely, the cutting and threading of pipe on the property. In addition to leaking hoses and pistons, another possible source of the contamination discussed was hydrocarbon-based coatings and coolants that L.B. Foster applied to pipes during the threading and cutting processes, which were allowed to run off onto the ground.

The officers also photographed a large metal container located west of "Building 5" on the property. The top was off the container and it had a foul, chemical odor. The container was not actively leaking during the officers' visits; but, from the tan-colored material present on its sides, it appeared that the container had overflowed or spilled at some earlier time. The ground near the container was a lighter color, further indicating that material from the container had spilled onto the ground.

Inspector Don Montgomery, an environmental investigator with the City of Houston, was also present at the facility on February 18. Inspector Montgomery collected six soil samples from different locations on L.B. Foster's property. Five of these samples were collected from areas of suspected oil contamination. Elevated levels of total petroleum hydrocarbons and the presence of certain heavy metals indicated that the soil in each of the five samples was contaminated with used oil.

Inspector Montgomery also collected a soil sample from near the metal container located west of Building 5. Inspector Montgomery collected the sample because he was concerned that the waste in the container, which appeared to have flowed onto the ground, was a type of paintwaste. Inspector Montgomery knew that most paint-wastes contain a high concentration of lead. When analyzed, the soil sample revealed hazardous levels of lead, approximately 12 times the level considered hazardous by the Environmental Protection Agency. Although L.B. Foster later disposed of it as a hazardous waste, the investigators never took a sample of the

material in the container to determine its properties.

On February 19, 1998, L.B. Foster retained T–2 Environmental, an environmental consulting firm, to assist with the clean-up efforts on its property. For the remainder of 1998 through the first quarter of 1999, Robert Finkelstein of T–2 Environmental supervised the remediation of the property, including the removal of 71 tons of lead-contaminated soil and 2916 cubic yards of hydrocarbon-contaminated soil. By the conclusion of the remediation, L.B. Foster had spent approximately $610,000 to clean-up its property.

Finklestein completed a site remediation report in April 1999. The following information contained in the report is of particular relevance to this case:

> This report documents the results of site remediation actions recently undertaken at the L.B. Foster Company property located at 6500 Langfied Road in Houston, Texas. . . .
>
> L.B. Foster Company and its predecessors have operated a pipe storage and distribution business at this location since acquiring the property in 1969. The L.B. Foster Company provides pipe for municipal and industrial customers and rail for the railroads. With the exception of the acquisition of new and faster threading machines in 1981, the manufacturing operations have remained essentially unchanged throughout the operating life of the facility.
>
> The pipe processing operations include cutting, grinding, threading, upsetting, and coupling of pipe according to customer-specified needs. The rail fabrication operations include rail punching and cutting to railroad specifications. Supporting operations include product-specific cleaning and coating operations, primarily involving the application of coatings and thread protectors as re-

quired to prevent product damage while in outdoor storage.

> The southwest area of the property is where fabrication occurs. This area is easily identified on the property plot plan since it contains the buildings housing the fabrication machinery. Areas in this part of the property are those where the site remediation actions documented herein were undertaken. Approximately 1/3 of the 129–acre property has been used for the outdoor storage and warehousing of raw materials and finished goods. Another 1/3 of the property has never been use for any industrial purpose.
>
> . . . .
>
> The areas at which soil remediation actions were undertaken are soil surfaces impacted by chronic leaks and spills of hydrocarbon substances occurring during the course of the normal industrial operations and throughout the facility's nearly 30–year operating life.
>
> The hydrocarbon substances primarily include oils, coolants, hydraulic fluids, and fuels leaked or spilled from equipment and machinery or while fueling vehicles used on-site (i.e., fork lifts, petti-bones, backhoe, etc.). The hydrocarbon substances also include rust prevention coatings and lubricants applied to pipe threads for protections from corrosion while in outdoor storage. These sources are associated with the industrial operations and equipment and the impacted soil areas are those in the vicinity of the buildings housing the fabrication equipment and operations.

On July 24, 2000, the State indicted L.B. Foster for two offenses: (1) knowingly disposing of used oil on its land and (2) knowingly and intentionally disposing of a hazardous waste, namely a solid waste exhibiting the toxicity characteristic for lead, without the required permits. The State

later amended the indictment in the hazardous waste case to drop the "intentionally" allegation. Bryan Causey was also indicted on the same charges but was granted a directed verdict following the close of the defense's case-in-chief. The jury found L.B. Foster guilty of both charges. After the trial court denied L.B. Foster's motion for new trial, these appeals followed.

## DISCUSSION

### A. Legal Sufficiency of Evidence for the Hazardous Waste Conviction

In issue one, L.B. Foster challenges the legal sufficiency of the evidence to establish that it knowingly disposed of a hazardous waste within the applicable statute of limitations period.

#### 1. *Standard of Review*

■ When reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *King v. State,* 29 S.W.3d 556, 562 (Tex.Crim.App.2000). In conducting this analysis, we may not re-weigh the evidence and substitute our judgment for that of the jury. *Id.* The standard is the same for both direct and circumstantial evidence cases. *Kutzner v. State,* 994 S.W.2d 180, 184 (Tex.Crim.App.1999). Sufficiency of the evidence is measured by the hypothetically correct jury charge, which accurately sets out the law, is authorized by the indictment, and does not unnecessarily increase the State's burden of proof. *Malik v. State,* 953 S.W.2d 234, 240 (Tex.Crim. App.1997).

#### 2. *Analysis*

■ The offense of knowingly disposing of a hazardous waste, as charged in this case, is found in Water Code subsection 7.162(a)(2), as follows:

(a) A person commits an offense if the person, acting intentionally or knowingly with respect to the person's conduct:

. . . .

(2) stores, processes, exports, or disposes of, or causes to be stored, processed, exported, or disposed of, any hazardous waste without all permits required by the appropriate regulatory agency. . . .

Tex. Water Code Ann. § 7.162(a)(2) (Vernon 2000). As a felony offense, a three-year statute of limitations applies to a charge under subsection 7.162(a)(2). *See* Tex.Code Crim. Proc. Ann. art. 12.01(6) (Vernon Supp.2003); *see also* Water Code Ann. §§ 7.162(b), 7.187(2)(G) (Vernon 2000). The indictment in the hazardous waste case alleged that L.B. Foster knowingly disposed of a hazardous waste "on or about February 18, 2000." The "on or about" language in an indictment provides that the State may prove a date other than the date alleged, as long as the date is before the presentment of the indictment and it is within the applicable statute of limitations. *See Sledge v. State,* 953 S.W.2d 253, 256 (Tex.Crim.App.1997). Because the indictment in the hazardous waste case was presented on July 24, 2000, the State was required to show that L.B. Foster committed the offense of knowingly disposing of a hazardous waste in violation of Water Code subsection 7.162(a)(2) on or after July 24, 1997. *See* Tex.Code Crim. Proc. Ann. art. 12.01(6).

■ If a defendant requests a jury instruction on its limitations defense, and there is some evidence that prosecution is time-barred, the State must then prove beyond reasonable doubt that prosecution is not limitations-barred. *Proctor v. State,* 967 S.W.2d 840, 844 (Tex.Crim.App.1998). Here, L.B. Foster requested a limitations

instruction; the trial court charged the jury as follows:

> This case was indicted on July 24, 2000. Thus, the State must prove beyond a reasonable doubt that the alleged offense occurred on or after July 24, 1997. If you find that State has failed to so prove, you should acquit the defendant on that basis alone.

We now turn to the evidence to determine whether it was legally sufficient to show that L.B. Foster knowingly discharged a hazardous waste on or after July 27, 1997.

### a. Circumstantial Evidence

■ The State maintains that the source of the lead contamination was the metal container located near Building 5, which Inspector Montgomery suspected contained paint-waste. Testimony was elicited at trial that the container was *not* actively leaking on February 18, 1998, when the Houston Police officers were investigating L.B. Foster's facility. On appeal, the State contends sufficient circumstantial evidence existed to allow the jury to reasonably infer that L.B. Foster's personnel knowingly caused the waste in the metal container to overflow onto the ground within the limitations period either by overfilling it or by failing to empty it in a proper manner. In support of its contention, the State cites to evidence in the record that suggests the metal container held some type of paint-waste, the waste contained lead, the waste in the container either overflowed or had some type of spillage associated with its being emptied or filled, and the waste spillage resulted in the soil near the container becoming contaminated with lead. Though such evidence may be sufficient to suggest a disposal of a hazardous waste, it is not probative by itself of the date of the alleged disposal.

The State also relies on evidence indicating that the area where the container was located was in "active use" by L.B. Foster during the limitations period. The State cites to the testimony of Steve Hart, L.B. Foster's vice-president of operations, who, in describing a map of L.B. Foster's 130–acre property, stated that the southern half of the property "predominantly has been used" while the northern portion was used infrequently. However, no evidence was introduced to show that the area of the lead contamination was used *only* during the limitations period, *i.e.*, between July 24, 1997 and July 24, 2000. To the contrary, when read in context, Hart's testimony indicated that predominantly the southern half of the property had been used during the entire course of L.B. Foster's 30–year operating history. Thus, Hart's testimony on this point does not support an inference that a disposal of hazardous lead-containing waste necessarily occurred within the limitations period.

The State also introduced two photographs of the metal container taken by Officer Dicker on February 18, 1998. The photographs show tan, paint-like material on the side of the container flowing in a downward pattern. Although it was not readily apparent from the photographs, Officer Dicker and Inspector Montgomery each testified that the ground near the container, where the soil sample was taken, was discolored. According to Inspector Montgomery, the waste was not only on the side of the container, but also on the ground near the container. Officer Dicker stated that the soil near Building 5, where the container was located, was a "lighter tan color," which appeared to be a "paint-type material or coating-type material."

In its brief, the State contends that, based on this evidence, the jury could "have rejected as unreasonable the claim that the hazardous waste spillage in an

active portion of the property had occurred prior to the limitations period and had thereafter stayed pristine and untroubled until discovered by Office Hatcher on February 18, 1998." As stated above, the State had the burden to show beyond a reasonable doubt that L.B. Foster knowingly disposed of a hazardous waste within the limitations period. The police officers' February 18 visit came only eight months after the start of the limitations period, *i.e.*, July 24, 1997. Without more, the presence of paint-waste on the side of the container and on the ground does not create a reasonable inference that the alleged disposal necessarily occurred within the limitations period. Beyond its mere existence, no evidence was offered to corroborate the State's theory that the paint-waste was spilled on or after July 24, 1997. To the contrary, a reasonable inference can be drawn that, by its very nature, paint-waste would not disappear readily and could potentially remain on the container and ground for a period beyond eight months. Thus, evidence of the presence of paint-waste on the outside of the container and on the ground, without more, is legally insufficient to establish that L.B. Foster disposed of the alleged paint-waste within the limitations period.

Viewing the circumstantial evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could not have found beyond a reasonable doubt that L.B. Foster disposed of a hazardous waste during the applicable limitations period.

### b. Passive Migration

As an alternative theory, the State contends the evidence was legally sufficient to support the jury's implicit finding that the State proved L.B. Foster knowingly disposed of a hazardous waste within the limitations period because, until the property was remediated, L.B. Foster allowed hazardous waste to "passively" (*i.e.*, without human conduct) migrate through the soil by way of natural forces such as rainwater, groundwater, and gravity. The State argues that L.B. Foster continued to (passively) dispose of hazardous waste until February 18, 1998, the date alleged in the indictment, which is well within the limitations period. In addition to promoting the theory on appeal, the State relied on the concept of passive disposal of hazardous waste at trial; the State informed the jury that, under the law, L.B. Foster committed a new and continuing offense each day the hazardous waste migrated through the ground.

As set out above, subsection 7.162(a)(2) provides that a person commits an offense if the person, acting intentionally or knowingly with respect to the person's conduct, disposes of, or causes to be disposed of, any hazardous waste without all permits required by the appropriate regulatory agency. TEX. WATER CODE ANN. § 7.162(a)(2). To determine whether L.B. Foster can be held criminally liable for a passive disposal, we must determine whether the meaning of "disposed of," as found in Water Code subsection 7.162(a)(2), includes the concept of passive disposal, or whether "disposed of" requires active human conduct. This is an issue of first impression in this State.

We begin our statutory analysis by recognizing that the Water Code has its own provision relating to the construction of its provisions. Water Code subsection 1.002(a), entitled "Construction of Code," provides as follows: "The Code Construction Act (Chapter 311, Government Code) applies to the construction of each provision in this code, except as otherwise expressly provided by this code." TEX. WATER CODE ANN. § 1.002(a) (Vernon 2000). This poses a potential conflict with the leading case on statutory construction

from the Court of Criminal Appeals, *Boykin v. State,* 818 S.W.2d 782, 786 (Tex.Crim.App.1991). *Boykin* established that the "plain language" approach to statutory construction must be employed, limiting interpretation to the express text of statute unless it is ambiguous or such a construction leads to an absurd result. *Id.*

The Code Construction Act allows consideration of extra-textual factors without requiring ambiguity in the text of the statute. *See* Tex. Gov't Code Ann. § 311.023 (Vernon 1998) (listing extra-textual factors). However, a conflict with *Boykin* is avoided by referencing *Lanford v. Fourteenth Court of Appeals,* in which the Court of Criminal Appeals carved out an exception to its *Boykin* rule by concluding that an ambiguity exists when the parties take polarized positions regarding the interpretation of a statute's text. *Lanford v. Fourteenth Court of Appeals,* 847 S.W.2d 581, 587 (Tex.Crim.App.1993); *see also Allen v. State,* 11 S.W.3d 474, 476 (Tex.App.-Houston [1st Dist.] 2000), *affirmed,* 48 S.W.3d 775 (Tex.Crim.App.2001). Because the parties here take polarized positions as to whether "disposal" includes the concept of "passive disposal," it is appropriate to apply the Code Construction Act, where necessary, in resolving this issue.

▮▮▮ The Water Code does not define the phrase "disposed of." Generally, undefined words in statutes are given their plain meaning unless the statute clearly shows that they were used in another sense. *See Daniels v. State,* 754 S.W.2d 214, 219 (Tex.Crim.App.1988); *Weyandt v. State,* 35 S.W.3d 144, 155 (Tex.App.-Houston [14th Dist.] 2000, no pet.). And statutory words are to be read in context and construed according to the rules of grammar and common usage. *Weyandt,* 35 S.W.3d at 155. However, the canons of construction dictate that words and phrases possessing a technical meaning are generally to be considered as having been used in their technical sense. *Medford v. State,* 13 S.W.3d 769, 772 (Tex.Crim.App. 2000) (citing 82 C.J.S. Statutes § 330 (1953)); *see also* Tex. Gov't Code Ann. § 311.011(b) (Vernon 1998) (providing that "Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."). Within the context of environmental statutes governing hazardous waste management, "disposal," which is the nominal form of "to dispose," has been defined to have a particular, technical meaning.

The Code Construction Act permits us to construe a provision in light of existing statutes covering the same or similar subjects. Tex. Gov't Code Ann. § 311.023(4). The Texas Solid Waste Disposal Act (TSWDA)[4] defines "disposal" as follows:

'Disposal' means the discharging, depositing, injecting, dumping, spilling, leaking, or placing of solid waste or hazardous waste, whether containerized or uncontainerized, into or on land or water so that the solid waste or hazardous waste or any constituent thereof may be emitted into the air, discharged into surface water or groundwater, or introduced into the environment in any other manner.

Tex. Health & Safety Code Ann. § 361.003(7) (Vernon 2001). Here, the trial court defined "disposal" for the jury in accordance with this statutory definition.[5]

---

4. The Texas Legislature enacted SWDA "to safeguard the health, welfare, and physical property of the people and to protect the environment by controlling the management of solid waste." Tex. Health & Safety Code Ann. § 361.002 (Vernon 2001).

5. This was the definition requested by the State at trial.

In construing a statute, a court may consider former statutory provisions. *See* TEX. GOV'T CODE ANN. § 311.023(4). Here, considering the former statutory versions of Water Code subsection 7.162(a)(2) is illuminating. The current language of Water Code subsection 7.162(a)(2) was at one time found verbatim in subsection 361.221(2) of TSWDA.[6] In 1997, the Legislature repealed section 361.221 and recodified it in Chapter 7 of the Water Code.[7] The definition of "disposal" found in TSWDA has remained unchanged since enactment in 1989.[8] Significantly, from 1991 until 1997, the definition of disposal currently found in TSWDA coexisted in that act with the now-repealed section 361.221. Thus, for six years, "disposal," within the context of an illegal disposal of a hazardous waste, had the meaning currently provided by subsection 361.003(7) of TSWDA.

Moreover, federal environmental statutes provide definitions for "disposal" nearly identical to that found in subsection 361.003(7). The Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA) defines "disposal" by referencing the definition of "disposal" found in the Resource Conservation and Recovery Act (RCRA), *see* 42 U.S.C. § 9601(29), which in turn defines "disposal" as follows:

> The term "disposal" means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

42 U.S.C. 6903(3).

Applying the relevant rules of construction, we conclude that the definition of "disposal" found in TSWDA subsection 361.003(7) is the appropriate definition for determining what constitutes an illegal disposal of a hazardous waste under Water Code subsection 7.162(a)(2). However, this does not end our inquiry; we are still left to determine whether, under that definition, a passive migration of hazardous waste through the soil, unaffected by affirmative human agency, constitutes a disposal for purposes of criminal liability under Water Code subsection 7.162(a)(2).

We begin by noting that the definition of disposal found in TSWDA subsection 361.003(7) is defined primarily in terms of active verbs such as "discharging," "depositing," "injecting," "spilling," "dumping," and "placing." Implicit in the common meanings of all of these acts is that they are set in motion by affirmative human conduct, whether purposeful or not. Though "leaking" may occur without human action, it does not describe passive migration of hazardous waste through the soil. *See* WEBSTER'S NEW COLLEGIATE DICTIONARY 648, (1981) (defining "leak" as, *inter alia*, "to enter or escape through an opening. . . ." One would never properly say that a hazardous waste is "leaking" through the soil. Rather, a hazardous waste leaks from some form of containment.

The State accurately points out that "discharging" is listed as a means of dis-

**6.** *See* Act of July 25, 1991, 72nd Leg., 1st C.S., ch. 3, § 8.04, sec. 361.221, 1991 Tex. Gen. Laws 4, 78.

**7.** Act of May 28, 1997, 75th Leg., R.S., ch. 1072, § 2, sec. 7.162, 1997 Tex. Gen. Laws 4094, 4110.

**8.** *See* Act of May 16, 1989, 71st Leg., R.S., ch. 678, § 1, sec. 361.003, 1989 Tex. Gen. Laws 2616, 2616–17.

posal in TSWDA's definition. Citing to chapter 26 of the Water Code, the State contends that the following definition should be applied to "discharge:"

> "To discharge" includes to deposit, conduct, drain, emit, throw, run, allow to seep, or otherwise release or dispose of, or to allow, permit, or suffer any of these acts or omissions.[9]

TEX. WATER CODE ANN. § 26.001(19) (Vernon 2000). Seizing upon the "allow to seep" portion of the definition, the State argues as follows: "A plain reading of this statutory definition indicates that the Legislature specifically made it a violation of the statute if a person fails to address, contain and remediate a source of contamination that, if not addressed, may seep and spread."

Chapter 26 of the Water Code pertains to water quality control. *See* TEX. WATER CODE ANN. §§ 26.001 .460 (Vernon 2000). Thus, the "to discharge" definition refers to a discharge relating to water; not a discharge of hazardous waste onto land. Without an indication of legislative intent, we are hesitant to apply a definition from a section of the Water Code that bears no relation to the facts of this case. *Cf.* TEX. GOV'T CODE ANN. § 311.023(4) (stating courts may consider laws on same or similar subjects). The evidence showed that groundwater was not impacted by the contamination in this case. It is also noteworthy that the above-definition of "to discharge" includes the definitional phrase "dispose of." Thus, under this definition, "to discharge" means to "dispose of," which is the very phrase we seek to interpret. The application of such a circular definition would be unavailing.

We must also view the phrase "disposed of" in the context of Water Code subsection 7.162(a)(2). When interpreting statutes, we seek always to effectuate the collective legislative intent or purpose. *Sanchez v. State*, 23 S.W.3d 30, 34 (Tex. Crim.App.2000). Appellate courts must give effect to the whole statute, not interpreting any phrase in isolation, but looking at the phrase *in situ*, or in the context of the entire statute in question. *Nguyen v. State*, 1 S.W.3d 694, 696 (Tex.Crim.App. 1999). As already mentioned, subsection 7.162(a)(2) states, in relevant part, "A person commits an offense if the person, *acting* intentionally or knowingly with respect to the person's *conduct* .... disposes of ... or causes to be ... disposed of, any hazardous waste without all permits required...." TEX. WATER CODE ANN. § 7.162(a)(2) (emphasis added). Although we recognize that "conduct" is defined in the Penal Code as an act *or omission* with the accompanying mental state,[10] the offense set forth in Water Code subsection 7.162(a)(2) is one of commission, not omission.[11] Thus, reading "disposed of" in the context of subsection 7.162(a)(2) shows a legislative intent to require affirmative human conduct. Such a reading precludes interpreting "disposed of" to include passive disposal.

As mentioned above, whether a disposal for purposes of committing an offense under subsection 7.162(a)(2) includes a "passive disposal" is a question of first impression in Texas. We recognize, as cited by L.B. Foster, that numerous federal courts have discussed whether the concept of "disposal" includes passive disposal within

---

9. The jury was not provided with a definition of "discharge."

10. TEX. PENAL CODE ANN. § 1.07(a)(10) (Vernon 2003).

11. This is not to say that intentionally or knowingly allowing a hazardous waste to leak or otherwise escape from some form of containment would not be a disposal for which a defendant could be prosecuted.

the context of CERCLA cost-recovery and enforcement actions. *Compare Niagara Mohawk Power Corp. v. Jones Chem., Inc.,* 315 F.3d 171, 178 (2nd Cir.2003) (holding passive movement of contaminant from one property to another not a CERCLA disposal) *and Carson Harbor Vill., Ltd. v. Unocal Corp.,* 270 F.3d 863, 879 (9th Cir. 2001) (concluding gradual passive migration of contamination through the soil was not "discharge, deposit, injection, dumping, spilling, leaking, or placing" and, therefore, was not a CERCLA "disposal") *with Nurad, Inc. v. William E. Hooper & Sons Co.,* 966 F.2d 837, 846 (4th Cir.1992) (holding past owners liable for the "disposal" of hazardous wastes that leaked from an underground storage tank).

■■■ We also recognize that, when the Texas Legislature adopts a statute with wording substantially similar to a federal statute, we presume, absent some indication to the contrary, that the legislature intended to adopt the construction placed on that wording by the federal courts, and we look to federal cases as a guide in interpreting the state statute. *See R.R. Street & Co., Inc. v. Pilgrim Enters., Inc.,* 81 S.W.3d 276, 290 (Tex.App.-Houston [1st Dist.] 2001, pet. filed) (finding federal case-law interpreting arranger liability under CERCLA instructive in determining arranger liability under TSWDA because applicable language of two statutes similar). Although TSWDA's definition of disposal is substantially similar to that of CERCLA, we find the federal CERCLA cases provide minimal assistance in determining whether a passive disposal can form the basis for criminal liability under Water Code subsection 7.162(a)(2). CERCLA cases discussing the concept of passive disposal involve the civil liability of the suspected polluter, while we are charged with determining whether a passive disposal of hazardous waste can sup-

port a criminal conviction. CERCLA is a strict-liability statute, while criminal liability under Water Code section 7.162 requires an intentional or knowing mental state. Significantly, none of the CERCLA cases discussing passive disposal do so in conjunction with a statute of limitations issue.

We have found only one case in any jurisdiction involving a criminal conviction based on the passive disposal of a hazardous waste. In *People v. Thoro Prods. Co.,* two criminal defendants were convicted for the passive disposal of hazardous waste under the Colorado Hazardous Waste Act, which contains a definition of disposal substantially similar to the one found in TSWDA. 45 P.3d 737, 740 (Colo App.Ct. 2001). In Thoro Products, the Colorado Court of Appeals vacated the convictions on the basis that to allow a conviction founded on the passive disposal of hazardous waste would render the applicable statute of limitations meaningless. *Id.* at 742. On this point, the *Thoro Products* court stated as follows:

> Looking to the statutory scheme as a whole, we observe that to construe "disposal" in the manner suggested by the People would, for all practical purposes, make the statute of limitation here a nullity. That is, if we interpret "disposal" here as an act that endures until hazardous wastes no longer percolate through or exist in soil or water, then disposal effectively continues until the substance dissipates to the point where it is no longer hazardous, possibly eons later, or until remediation occurs. Under this interpretation, the limitation period would begin only at this possibly remote moment in time, a time that, in all probability, could seldom, if ever, conclusively be pinpointed. In our view, the General Assembly did not intend such a result, because it would go against the very purpose for which stat-

utes of limitation are enacted, *i.e.*, to protect individuals from having to defend themselves against stale criminal charges and to prevent punishment for acts committed in the remote past.

*Id.* (internal citations omitted). We find the reasoning of the Colorado Court of Criminal Appeals persuasive. We agree that interpreting disposal to include the passive migration of hazardous waste through the soil eviscerates the applicable statute of limitations and forces defendants to defend themselves against stale claims that occurred in the remote past. *See id.* Certainly, such could not have been the intent of the Legislature when it enacted Water Code section 7.162.

We conclude that, for purposes of criminal prosecutions under Water Code subsection 7.162(a)(2), the term "disposal" does not include the passive disposal of hazardous wastes. In other words, a "disposal" of hazardous waste under section 7.162 requires more than the passive migration of waste through the soil unaided by affirmative human conduct. Some form of affirmative human conduct must accompany a disposal for it to rise to the level of criminal culpability.

### c. Continuing Offense

 As a corollary to the passive disposal theory, the State asserts that, each day it failed to remediate its property, L.B. Foster committed a continuing offense under Water Code subsection 7.162(a)(2). In support of this point, the State relies on Water Code section 7.186. However, the express language of section 7.186 negates the State's position. That section provides as follows: "Each day that a person engages in conduct proscribed by this subchapter constitutes a *separate* offense." TEX. WATER CODE ANN. § 7.186 (Vernon 2000) (emphasis added). Under the express language of section 7.186, each day that a person illegally dis-

poses of a hazardous waste is a *separate* offense, not a continuing offense. Because the Legislature has expressly stated its intent that the criminal, environmental offenses enumerated in Subchapter E, Chapter 7 of the Water Code be prosecuted as separate rather than continuing offenses, we cannot hold otherwise.

Moreover, regardless of whether the knowing disposal of a hazardous waste without the requisite permits is a continuing offense or not, the State's prosecution in this case was nonetheless time-barred. We have interpreted the phrase "disposed of" found in Water Code subsection 7.162(a)(2) to exclude the passive disposal of hazardous waste. Here, the State failed to present legally sufficient evidence of a "disposal" of a hazardous waste effectuated by affirmative human conduct within the applicable limitations period.

We sustain L.B. Foster's first issue presented and hold that the evidence was legally insufficient to support the hazardous waste conviction. Because of our disposition of issue one, we need not reach L.B. Foster's second, third, or fourth issues, which also challenge the hazardous waste conviction.

### B. Used Oil Offense

In seven issues, L.B. Foster challenges the used oil conviction on the basis that the indictment was jurisdictionally defective, the evidence was legally and factually insufficient to support the conviction, and the trial court failed to properly instruct the jury in the charge.

### 1. *Jurisdictional Defect*

 In issue five, L.B. Foster contends that the indictment charging the used oil offense is jurisdictionally defective because corporations cannot be prosecuted under the applicable statute—Water Code sub-

section 7.176(a)(2). That subsection provides "a person commits an offense if the *person* . . . knowingly . . . directly disposes of used oil on land." TEX. WATER CODE ANN. § 7.176(a)(2) (Vernon 2000) (emphasis added). L.B. Foster maintains that prosecutions under subsection 7.176(a)(2) are limited to individual persons and that the Legislature did not intend to include corporations within the definition of "person" under this subsection.

To determine whether the indictment was jurisdictionally defective, we must determine whether the term "person" in Water Code section 7.176 includes corporations. Subsection 1.07(38) of the Penal Code defines "person" as "an individual, corporation, or association." TEX. PENAL CODE ANN. § 1.07(38) (Vernon 2003). Subsection 1.07(38), which is in Title 1 of the Penal Code, is made applicable to the offenses enumerated in the Water Code by Penal Code subsection 1.03(b), which provides: "The provisions of Titles 1, 2, and 3 apply to offenses defined by other laws, unless the statute defining the offense provides otherwise; . . . ." TEX. PENAL CODE ANN. § 1.03(b) (Vernon 2003). Here, section 7.176 does not define "person" or otherwise indicate that a corporation cannot be prosecuted for the illegal disposal of used oil. Thus, under Penal Code subsections 1.03(b) and 1.07(38), L.B. Foster is a "person" for purposes of prosecution under Water Code section 7.176.

We continue our statutory analysis by noting that the Code Construction Act includes "corporation" in its definition of a "person." TEX. GOV'T CODE ANN. § 311.005(2) (Vernon 1998). As previously cited, Water Code subsection 1.002(a) states that the Code Construction Act applies to the construction of each provision of the Water Code, except as otherwise expressly provided in the code. Here, the Water Code does not indicate that the

Code Construction Act should not be applied to assist in interpreting section 7.176. And, because the parties take polarized positions regarding whether a corporation is a "person" for purposes of prosecution under section 7.176, we are free to apply the definition of "person" found in the Code Construction Act. *See Allen,* 11 S.W.3d at 476.

Whether construed according to the applicable provisions of the Penal Code or the Code Construction Act, we find a legislative intent to define "person" to include corporations for purposes of prosecuting violations under Water Code subsection 7.176(a)(2). Accordingly, we overrule L.B. Foster's issue five.

### 2. *Sufficiency of the Evidence*

In issues six and seven, L.B. Foster challenges the legal and factual sufficiency of the evidence to support the used oil conviction.

As stated above, when reviewing the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *King,* 29 S.W.3d at 562. In conducting this analysis, we may not reweigh the evidence and substitute our judgment for that of the jury. *Id.* We measure the sufficiency of the evidence by the hypothetically correct jury charge. *Malik,* 953 S.W.2d at 240.

In conducting a factual sufficiency review, we ask "whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof." *King,* 29 S.W.3d at 563. In reviewing factual sufficiency, the court of

appeals "may not reverse a jury's decision simply because it disagrees with the result; the appellate court must defer to jury findings, and may find the evidence factually insufficient only where necessary to prevent manifest injustice." *Cain v. State,* 958 S.W.2d 404, 407 (Tex.Crim.App.1997).

In its briefing, L.B. Foster acknowledges that "substantial photographic, testimonial, and documentary evidence of oil-contaminated soil" was presented at trial. L.B. Foster does not dispute this evidence; rather, it contends that the evidence is legally and factually insufficient to support the used oil conviction because Water Code subsection 7.176(a)(2) requires the State to present evidence that L.B. Foster *directly* disposed of used oil on its land. L.B. Foster points out that both Officer Hatcher and Officer Dicker testified that they did not observe any individual dumping, discharging, or pouring oil on the ground at L.B. Foster's facility.

In support of its position, L.B. Foster relies on the language of Water Code subsection 7.176(a)(2), which provides that a person commits an offense if the person "knowingly ... *directly* disposes of used oil on land." TEX. WATER CODE ANN. § 7.176(a)(2) (emphasis added). L.B. Foster argues that the State's evidence fails to show a *direct* disposal of used oil. Rather, L.B. Foster maintains that the State's evidence shows an *indirect* disposal of oil through an intervening agent, *e.g.,* the disconnected hoses. First, we do not agree with L.B. Foster's too-literal construction of subsection 7.176(a)(2). Second, even under L.B. Foster's interpretation of the statute, sufficient evidence was presented to support the conviction.

█ We apply the plain language of a statute unless that language is ambiguous or would lead to an absurd result the legislature could not possibly have intended. *Boykin,* 818 S.W.2d at 785; *see also*

*State v. Dyer,* 145 Tex. 586, 200 S.W.2d 813, 815 (1947) (stating a too-literal construction of a statute, which would prevent the enforcement of it according to its true intent, should be avoided). In analyzing the plain meaning of a statute, "[w]ords and phrases shall be read in context and construed according to the rules of grammar and usage." *Dowthitt v. State,* 931 S.W.2d 244, 258 (Tex.Crim.App.1996) (quoting TEX. GOV'T.CODE ANN. § 311.011(a) (Vernon 1998)).

Subsection 7.176(a)(2) provides as follows:

> (a) A person commits an offense if the person:
>
> . . . .
>
> (2) knowingly mixes or commingles used oil with solid waste that is to be disposed of in landfills or directly disposes of used oil on land or in landfills, . . . .

TEX. WATER CODE ANN. § 7.176(a)(2). Under its plain language, the subsection defines two offenses: (1) knowingly disposing of used oil in a landfill that has been mixed or commingled with solid waste and (2) knowingly disposing of used oil on land or in a landfill without its first being mixed or commingled with solid waste (*i.e.,* directly disposing of used oil on land or in a landfill). Read in context and according to rules of grammar and usage, the term "directly" signals to the reader that a distinction exists between the two offenses. From the context of the statutory provision, it is clear that the distinction is as follows: one offense involves mixing or commingling used oil with solid waste before disposing of it, while the other offense does not.

If we applied L.B. Foster's construction of the statute, a defendant who knowingly disposes of used oil through an "intervening agent" could not be prosecuted under

subsection 7.176(a)(2). We agree with the State that such a construction would lead to an absurd and unintended result. For example, Officer Dicker testified about hydrocarbon contamination in the area where hoses had been "disconnected." From the evidence presented, it is reasonable to infer that the hydrocarbon contamination resulted from the disconnection of the hoses. L.B. Foster offered no evidence to refute or discredit this evidence. Disconnection of a hose evidences a purposeful act.

Under L.B. Foster's reading of subsection 7.176(a)(2), this conduct would not be a disposal of used oil because it was accomplished "indirectly" through a hose. We do not believe that the Legislature intended such an interpretation. Rather, uncontroverted evidence indicating that "used oil" contamination resulted from the disconnection of hoses is legally and factually sufficient evidence to support L.B. Foster's conviction for illegal disposal of used oil. We conclude that evidence supporting a conviction under subsection 7.176(a)(2) will not be deemed insufficient merely because the State fails to show that the defendant "directly," *i.e.*, without an intervening agent, poured or dumped used oil on the ground.

Moreover, the State presented evidence showing "direct" (*i.e.*, without intervening agents) disposals of used oil in this case. The State's evidence showed that oil had been changed in a motor vehicle at L.B. Foster's facility; the used oil had been placed in a bucket and then dumped "directly" onto the ground. Photographic evidence showed overturned buckets near L.B. Foster's fueling station with black, oily sludge material oozing "directly" onto the ground. Photographic evidence also showed oily, liquid material sitting in uncovered buckets in one of L.B. Foster's buildings. On the floor surrounding the buckets, an oily substance can be seen on the floor along with absorbent material. Other evidence was presented that, as part of L.B. Foster's operations, a hydrocarbon material was poured on the pipes during the cutting and threading processes, which was then allowed to run from the pipes "directly" onto the ground or floor. In relation to this issue, L.B. Foster cites to no evidence in its brief that refutes or discredits this evidence.

Whether it is viewed in the light most favorable to the prosecution or neutrally, we hold the evidence was sufficient to show that L.B. Foster disposed of used oil on its land.

We overrule L.B. Foster's issues six and seven.

### 3. *Charge Error*

In issues eight through 11, L.B. Foster complains that the trial court failed to properly charge the jury with regard to the used oil offense.

#### a. Failure to Instruct the Jury on "Directly Disposes"

As a corollary to its contention presented in issues six and seven, L.B. Foster complains in issue eight that the trial court erred by omitting the modifying word "directly" from its abstract and application paragraphs describing the offense. We do not agree.

L.B. Foster requested the trial court to instruct the jury that the charged offense required the State to prove that L.B. Foster knowingly and *directly* disposed of used oil on land. As discussed in connection with issues six and seven, the adverb "directly" found in subsection 7.176(a)(2) distinguishes the two offenses defined in that subsection. In this case, L.B. Foster was charged with only one of these offenses: knowingly disposing of used oil on land. As such, it was unnecessary for the trial court to instruct the jury utilizing the

modifier "directly." If the trial court had instructed the jury as requested by L.B. Foster, the term "directly," taken out of context, would have been superfluous at best, and misleading at worst. We hold the trial court did not err in refusing to instruct the jury that the State was required to prove a "direct" disposal.

We overrule L.B. Foster's issue eight.

### b. Statute of Limitations

■ In issue nine, L.B. Foster contends that the trial court erred in denying its request to instruct the jury on the defense of limitations. L.B. Foster asserted the limitations issue by requesting a jury instruction, which the trial court refused.

■ To be entitled to a jury instruction on limitations, the issue must be supported by the evidence presented at trial. *See Howlett v. State*, 994 S.W.2d 663, 667 (Tex. Crim.App.1999). The State presented the following evidence showing recent "used oil" contamination in relation to the police officers' investigation on February 18, 1998:(1) photographic evidence showing that oil contamination was on the vegetation in the area where the oil from the motor vehicle had been dumped even though, as testified by Officer Hatcher, there had been a recent rain; (2) Officer Dicker's testimony that he observed a "pool of hydrocarbons" standing near the disconnected hoses; (3) photographic and testimonial evidence indicating that absorbent material had been placed on the floor of L.B. Foster's facility to soak up contamination near the uncovered buckets containing an oily material; and (4) testimonial evidence from which it could be inferred that, as of the date of the investigation, L.B. Foster's employees continued to pour hydrocarbon materials on pipes during the cutting and threading processes, which then ran onto the ground. The felony indictment against L.B. Foster was presented in July 2000, well within the applicable three-year statute of limitations.

We overrule issue nine.

### c. Conduct Requirement

■ In issue 10, L.B. Foster contends that the trial court erred in failing to properly instruct the jury on the conduct requirements found in Penal Code subsection 6.01(c), which provides as follows: "A person who omits to perform an act does not commit an offense unless a law as defined by Section 1.07 provides that the omission is an offense or otherwise provides that he has a duty to perform the act." TEX. PENAL CODE § 6.01 (Vernon 2003). Related to this issue, L.B. Foster requested the trial court to instruct the jury as follows:

> A person who omits to perform an act does not commit an offense unless a law—namely, the constitution or a statute of Texas or the United States, a written opinion of a court of record, a municipal ordinance, an order of a county commissioners court, or a rule authorized by and lawfully adopted under a statute—provides that the omission is an offense or otherwise provides that he has a duty to perform the act.

The trial court denied L.B. Foster's requested instruction. L.B. Foster maintains that without its requested instruction, the State was permitted to argue, and the jury was permitted to find, that the offense of illegal disposal of used oil could be proven through "passive disposal," or through evidence that L.B. Foster failed to remediate its property.

The State's indictment charged L.B. Foster with the affirmative act of "unlawfully, knowingly, dispos[ing] of used oil on land." The indictment did not charge L.B. Foster with an act by omission. Subsection 7.176(a)(2) does not make the omission

of an act an offense, nor does it place an affirmative duty to act on an individual. *See* TEX. WATER CODE ANN. § 7.176(a)(2). The charge also comported with the State's evidence relating to the used oil offense. As discussed in relation with previous issues, the State presented evidence showing that L.B. Foster disposed of used oil on its land through affirmative human conduct, such as, by dumping used motor oil on the ground.

The trial court charged the jury as follows: "A person commits an offense if the person knowingly disposes of used oil on land." Thus, if the jury followed the charge, as we presume it did, it could not have found L.B. Foster guilty on the basis of an omission or a failure to act. L.B. Foster has cited no case, and we find none, in which a trial court's failure to give an instruction such as the one requested here was found to be error. *See Cruz v. State*, 820 S.W.2d 41, 43 (Tex.App.-Austin 1991, pet. ref'd) (holding that defendant was not harmed by trial court's failure to give subsection 6.01(c) instruction without determining whether failure to give instruction was erroneous).

We overrule L.B. Foster's issue 10.

### d. Culpable Mental State

In issue 11, L.B. Foster contends that the trial court failed to properly instruct the jury in relation to the "knowingly" culpable mental state specified by the Water Code subsection 7.176(a)(2). Penal Code section 6.03 delineates three "conduct elements" that may be involved in an offense: (1) the nature of the conduct; (2) the result of the conduct; and (3) the circumstances surrounding the conduct. *McQueen v. State*, 781 S.W.2d 600, 603 (Tex.Crim.App.1989); *Lugo-Lugo v. State*, 650 S.W.2d 72, 74 (Tex.Crim.App.1983). Here, the charge defined "knowingly" as follows:

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that circumstances exist.

The used oil offense involved here requires two separate, culpable mental states. The first is that the actor knowingly disposed of used oil. TEX. WATER CODE ANN. § 7.176(a)(2). The second is that the actor knew the object of the disposal is "used oil." With regard to the conduct elements, to commit the offense of illegal disposal of used oil, a person must act knowingly with respect to both the nature of his conduct (*i.e.,* the disposal) and the circumstances surrounding his conduct (*i.e.,* that what he is disposing of was used oil).

L.B. Foster does not complain of the abstract paragraph defining "knowingly." Indeed, the trial court instructed the jury on the proper and applicable definitions of "knowingly" in this case. Instead, L.B. Foster contends that, as worded, the application paragraph allowed the State to argue, and the jury to find, that the "knowingly" element was satisfied with respect to the disposal through evidence that L.B. Foster knew "circumstances" of oil contamination existed, rather than finding that L.B. Foster was aware of the nature of its conduct, *i.e.,* the disposal. Without a specific explanation, L.B. Foster argues that the confusion could have been avoided by separately defining the constituent elements of the used oil offense for which "knowingly" had to be proven.

In relation to this issue, L.B. Foster's "Proposed Jury Instruction No. 6." stated as follows:

In order to prove the alleged offense of used oil disposal against either defendant, the State must prove each of the following essential elements by proof beyond a reasonable doubt:

First, that the defendant knowingly and directly disposed of oil on or after July 24, 1997.

Second, that the oil, when defendant disposed of it, was used.

Third, that the defendant knew the oil, when defendant disposed of it, was used.

Fourth, that the exception I read to you previously does not apply to defendant's conduct.

As to defendant company, L.B. Foster Company, the State must also prove beyond a reasonable doubt:

Fifth, that the commission of the alleged offense was authorized, requested, commanded, performed, or recklessly tolerated by a high managerial agent acting in behalf of the corporation and within the scope of his office or employment.

The application paragraph submitted to the jury in this case stated as follows:

Now, if you find from the evidence beyond a reasonable doubt that in Harris County, Texas, on or about the 18th day of February, 1998, the defendant, L.B. Foster Company, did then and there unlawfully, knowingly dispose of used oil on land located near 6500 Langfield, you will find the defendant guilty as charged in the indictment. Unless you so believe from the evidence beyond a reasonable doubt thereof, you will acquit the defendant and say by your verdict "Not Guilty."

In the application paragraph given by the trial court, the term "knowingly" directly modifies the phrase "disposes of." Thus, there was no danger the jury could have read the application paragraph to allow a finding of guilt based on knowing

of the oil contamination. We conclude that the trial court did not err in failing to submit L.B. Foster's proposed application paragraph to the jury.[12]

We overrule L.B. Foster's issue 11.

## CONCLUSION

Because we sustain L.B. Foster's legal sufficiency challenge in the hazardous waste case, trial court cause number 0850911, we reverse the judgment of the trial court and render a judgment of acquittal. We affirm the judgment of the trial court in the used oil offense case, trial court cause number 0850910.

---

12. To the extent that L.B. Foster complains that the State improperly argued during summation that the "disposed of" element was satisfied by evidence that L.B. Foster was aware of the "circumstances" of oil contamination, we note that L.B. Foster failed to object to the State's closing argument on this point and has failed to raise this as a separate issue on appeal.