

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00157-CR

———————————————

THOMAS EDWARD BLANKENSHIP, Appellant

V.

THE STATE OF TEXAS

On Appeal from the County Court at Law
Hood County, Texas
Trial Court No. 52381

Before Sudderth, C.J.; Womack and Walker, JJ.
Opinion by Chief Justice Sudderth
Dissenting Opinion by Justice Walker

**OPINION**

Appellant Thomas Edward Blankenship challenges his conviction for Class A misdemeanor unlawful burning on various sufficiency grounds. In his first two issues, Blankenship argues that there is no evidence that the "treated wood, soda cans, and bottles" he was charged with burning qualify as "heavy oils, asphaltic materials, potentially explosive materials, or chemical wastes," as is required for the enhancement of his otherwise-Class C offense to a Class A misdemeanor. Because we agree with Blankenship on this point, and because none of Blankenship's other sufficiency arguments are meritorious, we will reduce his conviction to a Class C misdemeanor and remand the case for a new punishment hearing.

## I. Background

As Sergeant Joshua Lane and Deputy Ciji Montemayor drove to Blankenship's property to conduct an unrelated warrant investigation, they saw him tending a fire that was emitting black smoke.[1] Blankenship told the officers that he was burning plywood, which Sergeant Lane and Deputy Montemayor later testified they considered illegal to burn.[2] As Sergeant Lane walked closer to the fire, he noticed

---

[1]Sergeant Lane—who had previously worked as a volunteer firefighter—later testified that he considered black smoke to be an indication that a fire is burning toxic or illegal materials, and Deputy Montemayor—a former fire marshal—confirmed that lawful fires containing natural vegetation do not produce black smoke.

[2]On cross-examination, Deputy Montemayor confirmed that "there's such a thing as untreated plywood."

"treated wood, bottles[,] . . . some glass[,] . . . some soda cans," and "at least . . . one paint can in the fire." Deputy Montemayor similarly saw a "spray paint can," "paint cans[,] . . . plywood[,] and metal items" in the fire.

The officers arrested Blankenship and extinguished the fire. Neither officer seized or tested any physical evidence from the scene. However, they took photos of the fire, and they recorded the interaction with Blankenship on their body cameras.

Blankenship was charged by information with "intentionally or knowingly burn[ing] treated wood, soda cans, and bottles, in violation of Section 382.018 of the Texas Health and Safety Code, Section 111.219(7) of the Texas Administrative Code, and Sections 7.177 and 7.187(b)(3) of the Texas Water Code." The information did not allege any prior convictions for outdoor burning.

Blankenship's case was tried to the court. The officers testified regarding their interaction with Blankenship and the items they saw in the fire. They explained that they understood "[a]nything that's not natural to the earth" to be illegal to burn, and that because plywood contained substances not natural to the earth—the "adhesive used to hold it together" and "materials to keep it from rotting"—they considered burning plywood to be illegal.

In addition to the officers' testimony, the State offered video footage from both officers' body cameras, a photograph of the fire, and a photograph of Blankenship's nearby shed. The body-camera footage captured Blankenship's

3

admission that he was burning plywood and provided periodic views of the fire from various vantage points.

The defense called Jeremy Cosgrove, a fire investigator, to testify as an expert. Cosgrove testified that "[t]reated wood[,] as far as the industry standard goes[,]" contemplates wood that "is normally treated with a copper solution that prevents any kind of rotting or deterioration of the wood." Cosgrove also stated that not all plywood is treated, that treated wood can be "extremely hard" to distinguish from untreated wood on sight, that the two types of wood cannot be distinguished by the color of the smoke they emit while burning, and that there is ultimately "no way to see if a [piece of] wood's been treated or not without a forensic analysis of that material to determine what chemical compositions are within that material."[3]

The trial court found Blankenship guilty of Class A misdemeanor "outdoor burning of waste toxic material," and sentenced him to 45 days' confinement with a $1,500 fine. *See* Tex. Penal Code Ann. § 12.21.

---

[3]Cosgrove stated that the same was true of other burned materials. Although an individual can examine the remains of a fire and form a hypothesis as to what items had been burned, Cosgrove testified that laboratory testing is necessary to determine if the items "actually sustained combustion."

4

## II. Discussion

Blankenship raises three issues on appeal, all of which challenge the sufficiency of the evidence in some way.[4] Blankenship argues that his Class A misdemeanor conviction must be reversed because (1) there is insufficient evidence regarding the nature of the items burned, i.e., that they qualified as "heavy oils, asphaltic materials, potentially explosive materials, or chemical wastes"; (2) there is insufficient evidence that the prohibited items were actually located in the fire because the body-camera footage "indisputabl[y]" contradicts the officers' testimony; and (3) there is insufficient evidence that Blankenship's fire was not authorized under a statutory exception.

### A. Standard of Review

In our evidentiary-sufficiency review, we consider all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). The crime's elements are defined by the hypothetically correct jury charge, which accurately sets out the law, is authorized by the

---

[4]The three issues listed in Blankenship's brief are reordered and restructured for organizational purposes. We construe the first two issues listed in his brief as the three issues listed above, and we do not address the final issue listed in Blankenship's brief—which challenges Sergeant Lane's testimony regarding the significance of "black smoke"—as the issue is resolved by our other holdings. *See infra* note 17.

information,[5] does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the offense for which the defendant was tried. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016); *see also Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018) ("The essential elements of an offense are determined by state law.").

Here, Blankenship was tried for committing the offense of unlawful burning. *See* Tex. Health & Safety Code Ann. § 382.018; Tex. Water Code Ann. § 7.177(a)(5); 30 Tex. Admin. Code § 111.219 (2022) (Tex. Comm'n on Env't Quality, General Requirements for Allowable Outdoor Burning).

## B. Applicable Law

The statutory scheme for the offense of unlawful burning "is not straightforward; the statutes are found in at least two codes, and the restrictions on burning are scattered through the Administrative Code." *State v. Rhine*, 297 S.W.3d 301, 307 (Tex. Crim. App. 2009); *see* Tex. Health & Safety Code Ann. § 382.018; Tex. Water Code Ann. § 7.177(a)(5).

The groundwork for the offense is laid in the Texas Clean Air Act, which authorizes the Texas Commission on Environmental Quality (TCEQ) to establish rules to "control and prohibit the outdoor burning of waste and combustible

---

[5]The phrase "authorized by the information" refers to the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

material." Tex. Health & Safety Code Ann. § 382.018(a). TCEQ implemented this legislation by adopting a broad rule prohibiting "any outdoor burning . . . except as provided,"[6] 30 Tex. Admin. Code § 111.201 (2022) (Tex. Comm'n on Env't Quality, General Prohibition), then it carved out exceptions to authorize, for example, "recreational" fires, *id.* § 111.207 (2022) (Tex. Comm'n on Env't Quality, Exception for Fires Used for Recreation, Ceremony, Cooking, and Warmth), and "domestic waste" fires disposing of items such as "kitchen garbage[ and] untreated lumber," *id.* § 111.209 (2022) (Tex. Comm'n on Env't Quality, Exception for Disposal Fires). Even when an outdoor burning is otherwise authorized, though, it is subject to restrictions on the location, timing, and meteorological conditions. And burning "[e]lectrical insulation, treated lumber, plastics, non-wood construction/demolition materials, heavy oils, asphaltic materials, potentially explosive materials, chemical wastes, and items containing natural or synthetic rubber" is strictly prohibited. *Id.* § 111.219(7) (2022) (Tex. Comm'n on Env't Quality, General Requirements for Allowable Outdoor Burning).

The legislature criminalized the violation of a TCEQ rule adopted under the Clean Air Act, and it established the punishment for unlawful burning in particular. Tex. Water Code Ann. §§ 7.177(a)(5), 7.187(b); *see Rhine*, 297 S.W.3d at 312 (concluding that "the legislature defined the elements of the offense and left to TCEQ

---

[6]Blankenship's information did not allege that he violated the broad prohibition on outdoor burning in Rule 111.201.

only 1) the determination of what materials that, when burned, created the air contaminants that were the concern of the legislature, and 2) control over the places and conditions under which those materials may be burned"). Generally, unlawful burning is a Class C misdemeanor, but the offender's criminal history and the nature of the item burned may enhance the crime's classification. Tex. Water Code Ann. § 7.187(b). The legislature grouped prohibited items into three punishment tiers: (1) "heavy oils, asphaltic materials, potentially explosive materials, [and] chemical wastes," the burning of which is punished with the most severity; (2) "insulation on electrical wire or cable, treated lumber, plastics, non-wood construction [and] demolition materials, furniture, carpet, [and] items containing natural or synthetic rubber," the burning of which is punished with moderate severity; and (3) all other items, the burning of which is punished with the lowest degree of severity. *Id.*

Unlawful burning is

> (1) a Class C misdemeanor if the violation is a first violation and does not involve the burning of [high-severity items];
>
> (2) a Class B misdemeanor if the violation is a second or subsequent violation and:
>
>> (A) the violation does not involve the burning of:
>>> (i) [high-severity items]; or
>>> (ii) [moderate-severity items]; or
>> (B) the violation involves the burning of [moderate-severity items] and none of the prior violations involved the burning of [high-severity items] or [moderate-severity items]; or
>
> (3) a Class A misdemeanor if the violation:

8

(A)  involves the burning of [high-severity items]; or
(B)  is a second or subsequent violation and involves the burning of [moderate-severity items] and one or more of the prior violations involved the burning of [high-severity items] or [moderate-severity items].

*Id.* (indentation altered).  In other words, for a first-time unlawful burning offense, as Blankenship was charged with committing here, an individual commits a Class A misdemeanor if he unlawfully burns a prohibited item that is proven to be a high-severity item, and he commits a Class C misdemeanor if he unlawfully burns any other prohibited item.  *See id.*

## C.  Nature of Burned Items

Blankenship's first sufficiency challenge relates to the nature of the items burned and whether the evidence supports the enhancement of his offense to a Class A misdemeanor.

Blankenship was charged by information with "intentionally or knowingly burn[ing] [1] treated wood, [2] soda cans, and [3] bottles."[7]  Such conduct constitutes a Class A misdemeanor only if the nature of at least one of these items was proven at trial to be not only prohibited but also a high-severity item, i.e., "heavy oils, asphaltic materials, potentially explosive materials, or chemical wastes."  Tex. Water Code Ann. § 7.187(b)(1), (3).

---

[7]Both parties implicitly assume that the hypothetically correct jury charge requires the State to prove at least one of the three items listed in Blankenship's indictment.

9

The State does not claim that it offered any evidence to prove that one of the three listed items qualifies as "heavy oils [or] asphaltic materials." And although in its brief the State contends that there is evidence of "potentially explosive materials" in the fire—specifically, a spray paint can—it abandoned this position at oral argument, admitting that "the spray paint can is not even listed in [the] information."[8] *See Nelson v. State*, 607 S.W.2d 554, 555 (Tex. Crim. App. 1980) (declining to address ground of error abandoned at oral argument). This leaves only "chemical wastes" as the relevant high-severity category.

The State argues that the "soda cans[] and bottles" listed in the information were proven at trial to be "chemical wastes," and that the "treated wood" was proven to be both "treated lumber" and "chemical wastes."[9] Blankenship counters that none of the items in his fire were proven to be "chemical wastes," and that the plywood was not even shown to have been "treated."

---

[8]At oral argument, the State was asked directly: "What is your position here today? What substances were being burned that were illegal?" The State listed only the items in the information—"treated wood or plywood, soda cans, bottles"—and it contended that these items qualified as "chemical wastes."

[9]"It is well established that the State may plead in the conjunctive and charge [and prove] in the disjunctive." *Cada v. State*, 334 S.W.3d 766, 771 (Tex. Crim. App. 2011); *Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim. App. 1991) (similar); *see also Caddel v. State*, No. 05-97-02079-CR, 1999 WL 993862, at *1 (Tex. App.—Dallas Nov. 1, 1999, pet. ref'd) (per curiam) (not designated for publication) (applying rule in bench-trial context); *Griff v. State*, No. B14-92-00752-CR, 1993 WL 487500, at *3 (Tex. App.—Houston [14th Dist.] Nov. 24, 1993, pet. ref'd) (similar). Consequently, the State was only required to prove that one of the three items listed in the information qualified as "chemical waste[]."

10

### 1. Soda Cans and Bottles

In its brief, the State fails to explain why the "soda cans"[10] or "bottles" in Blankenship's fire should qualify as "chemical wastes."[11] Nor did its response at oral argument provide such an explanation. When asked why the soda cans and bottles were toxic, the State explained that "you've got aluminum, [and] you've got different chemical components that go into having to process those in a factory to make a bottle or a can." Even assuming the plain meaning of "chemical wastes" is as broad as the State's explanation implies—and even assuming that the State preserved this argument despite failing to brief it—the record contains no evidence of the soda cans' or bottles' allegedly toxic factory process. Sergeant Lane testified that he saw "soda cans" and a "glass bottle" in the fire, but he did not elaborate on the cans or bottles, nor did he state that the cans or bottles were manufactured or contaminated with any lingering chemicals. Deputy Montemayor did not discuss the soda cans or glass

---

[10]The State's brief broadly refers to all cans, and it focuses its argument on the contention that there was evidence of spray paint cans burning in the fire. But, as already noted, the State abandoned its reliance on the spray paint cans at oral argument.

[11]The State's brief also describes the bottles as "plastic." But the only mention of a plastic bottle was when Deputy Montemayor was asked what she could see from an unidentified still shot of her body-camera video, and even then, she did not state that the plastic bottle was in the fire but that it was "near the broom." The only testimony that there was a bottle actually in the fire came from Sergeant Lane, who described the relevant bottle as "glass." Moreover, "[t]here is a conflict between [30 Tex. Admin. Code § 111.219(7)'s] overarching prohibition on plastics and § 111.209(1)'s allowance of packaging plastics in domestic waste." *Rhine*, 297 S.W.3d at 309 n.5 (discussing TCEQ rules).

11

bottles allegedly in the fire, and nothing in the documentary or video evidence demonstrated that the cans or bottles were contaminated with chemicals of some sort.

In short, the evidence was insufficient to support a finding that the "soda cans" or "bottles" referenced in Blankenship's information were "chemical wastes."

## 2. Treated Wood

The Class A enhancement can thus be narrowed to one prohibited item listed in Blankenship's information: "treated wood." It is undisputed that Blankenship was burning plywood, that this is the "wood" referenced in his information, and that if there is sufficient evidence that the plywood was in fact "treated" then it qualifies as "treated lumber" within the meaning of the Water Code and relevant TCEQ rules.[12] *See* Tex. Water Code Ann. § 7.187(b)(2)(A)(ii); 30 Tex. Admin. Code § 111.219(7) (2022) (Tex. Comm'n on Env't Quality, General Requirements for Allowable Outdoor Burning). But the parties dispute whether the adhesives used to manufacture the plywood qualify as "treat[ments]" and whether such alleged "treat[ments]" convert the plywood into not only "treated lumber" but also "chemical waste[]."

---

[12]The parties do not dispute that plywood is a type of lumber. Indeed, lumber is produced by cutting timber or logs into planks. *See Lumber*, Webster's Third New International Dictionary 1345 (2002) (defining "lumber" as, among other things, "timber or logs esp. after being prepared for the market"). And, as discussed below, plywood is created by cutting lumber into thin strips and then gluing those strips together to strengthen and stabilize the wood product. Thus, all plywood is lumber, but not all lumber is plywood. A lay person walking through a hardware store could easily distinguish a sheet of plywood from an ordinary piece of lumber.

### a. Sufficient Evidence of "Treatment"

The State characterizes the adhesives used to manufacture Blankenship's plywood as "treat[ments]," but Blankenship claims that these are not "treat[ments]," and he argues that the State was required to test the plywood to demonstrate that it was "treat[ed]" based on its chemical composition.

### i. Plain Meaning

"[T]reated lumber" is a statutory term, and statutory construction is a question of law which we review de novo. *Lang v. State*, 561 S.W.3d 174, 180 (Tex. Crim. App. 2018); *Mason v. State*, 598 S.W.3d 755, 767 (Tex. App.—Fort Worth 2020, pet. granted). The term "treated lumber" is not defined in the Clean Air Act or in any of the applicable TCEQ rules, and the parties rely on different definitions of it—the State on a definition extrapolated from a parenthetical in a 2015 TCEQ manual, and Blankenship on the "industry standard" testified to by his expert. We do not adopt either definition.

Instead, we apply the "plain meaning rule"—an "ancient" method of interpretation that is "constitutionally and logically compelled." *Boykin v. State*, 818 S.W.2d 782, 785–86 (Tex. Crim. App. 1991); *see Rhine*, 297 S.W.3d at 310–12. This is the method the Texas Court of Criminal Appeals employed when it faced similarly undefined-but-unambiguous terms in the Clean Air Act. *Rhine*, 297 S.W.3d at 310–12 (applying plain meaning rule to interpret "waste" and "combustible material" in Tex.

13

Health & Safety Code Ann. § 382.018 and in TCEQ rule establishing "domestic waste" exception).

Following that court's example, we read "words and phrases . . . in context and . . . according to the rules of grammar and common usage."[13] *Rhine*, 297 S.W.3d at 310 (quoting Tex. Gov't Code Ann. § 311.011). We "may consult standard dictionaries in determining the fair, objective meaning of undefined statutory terms." *Lang*, 561 S.W.3d at 180; *see Watkins v. State*, 619 S.W.3d 265, 272–73 (Tex. Crim. App. 2021) (similar). Only if the plain language is ambiguous or would lead to an absurd result may we, "out of absolute necessity," consider such extratextual factors as administrative interpretations of the statute. *Rhine*, 297 S.W.3d at 310 (quoting *Boykin*, 818 S.W.2d at 785).

---

[13]There is an exception to the plain-meaning rule for technical meanings: "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." *Rhine*, 297 S.W.3d at 310 (quoting Tex. Gov't Code Ann. § 311.011); *see Medford v. State*, 13 S.W.3d 769, 772 (Tex. Crim. App. 2000). But this exception is not applicable here.

Technical terms are those "which have a known and established legal meaning, or which have acquired a peculiar and appropriate meaning in the law, as where the words used have a well-known common law meaning," such as the term "arrest." *Medford*, 13 S.W.3d at 772. Here, the term "treated lumber" has not been statutorily defined, nor has it acquired a common legal meaning. *Cf. Green v. State.*, 476 S.W.3d 440, 445 (Tex. Crim. App. 2015) (agreeing with the lower court "that the terms 'penetration' and 'female sexual organ' are common terms that have not acquired a technical meaning"); *Kirsch v. State*, 357 S.W.3d 645, 650 (Tex. Crim. App. 2012) (reiterating in DWI case "that 'operate' is a common term that has not acquired a technical meaning and may be interpreted according to its common usage").

The plain meaning of "treated" is neither ambiguous nor absurd.  In the context of the phrase "treated lumber," the verb "to treat" means "to subject (as a natural or manufactured article) to some process to improve the appearance, taste, usefulness, or some other quality."  *Treat*, Webster's Third New International Dictionary 2434–35 (2002).  Similarly, a "treatment" is a "subjection of something to the action of an agent or process," as in "sewage treatment"; "something (as a fertilizer or preserver) used in treating," as in "a seed disinfectant treatment."  *Treatment*, Webster's Third New International Dictionary 2435 (2002); *see Treatment*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/treatment (last visited July 7, 2022) (defining term as, among other things, "something (such as a product or technique) used in treating, enhancing, or improving the performance, condition, or appearance of someone or something").

Here, both parties' witnesses testified that plywood was manufactured with adhesives.  Sergeant Lane stated that, based on his study and training, he knew plywood to be manufactured with certain additives, such as "[g]lues, as well as other kind[s] of materials to keep it from rotting."  Deputy Montemayor similarly testified that plywood contains "treated chemicals for the lumber and . . . adhesive used to hold it together."  And Blankenship's own expert testified that plywood is created from "small sheets of wood" that are manufactured with "some type of adhesive and pressure to push those pieces of wood together in turn creating the different plies of the plywood."  There was thus evidence that plywood—which Blankenship admitted

15

burning—consists of basic sheets of wood "subject[ed] . . . [to a] process" using glues and similar additives to "enhanc[e] or improv[e] . . . [its] performance, condition, or appearance" by binding the sheets of wood together.[14] *Cf. Treat*, Webster's Third New International Dictionary 2434–35 (2002); *Treatment*, Webster's Third New International Dictionary 2435 (2002); *Treatment*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/treatment (last visited July 7, 2022). This fits within the plain meaning of the term "treated lumber."[15]

---

[14]This conclusion is limited to the evidence presented at Blankenship's trial. We do not hold that plywood is de facto "treated lumber" but that the evidence presented here supported a reasonable conclusion that the plywood qualified as "treated lumber."

[15]Although we generally consider agency constructions only if the plain language is ambiguous or leads to an absurd result, because the criminalized restrictions on burning are partially defined by TCEQ and "scattered through[out] the Administrative Code," *Rhine*, 297 S.W.3d at 307, 310, we note that our plain-language interpretation of "treated lumber" is consistent with TCEQ's parallel environmental regulations.

In its regulation of certain solid waste incineration units' emissions, TCEQ distinguishes between "untreated wood" and "treated wood"—it defines "[w]ood waste" as "[u]ntreated wood and untreated wood products" and it specifically provides that "[w]ood waste does not include: . . . [t]reated wood and treated wood products, including . . . manufactured wood products that contain adhesives or resins (e.g., plywood, particle board, flake board, and oriented strand board)." 30 Tex. Admin. Code § 113.2300(41) (2022) (Tex. Comm'n on Env't Quality, Definitions); *cf. L.B. Foster Co. v. State*, 106 S.W.3d 194, 203–04 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (reviewing criminal Water Code violation and applying technical meaning of "disposal" given to the term in other state and federal environmental statutes). This definition lends further support to our plain-meaning interpretation and to our conclusion that a reasonable factfinder could have concluded that Blankenship's plywood qualified as "treated." *But see Boykin*, 818 S.W.2d at 786 n.4 (commenting that the Code Construction Act "invites, but does not require, courts to consider

## ii. No Testing Required

Blankenship contends, though, that the State could not prove that the plywood was "treated lumber" without confiscating and scientifically testing it to verify its chemical composition.[16]  Blankenship has not cited any case law to support his proposed testing requirement but instead analogizes the plywood to marihuana.  He reasons that because the legislature distinguishes between marihuana and hemp, because the substances are governed by different regulations and prohibitions, and because they can be difficult for non-experts to distinguish by sight or smell, testing is "'absolutely' a must" to prove a marihuana-based offense beyond a reasonable doubt.  According to Blankenship, the same is true of treated and untreated lumber; because the legislature distinguishes between the two, and because they can be difficult for non-experts to distinguish by sight or smell, it was "impossible" for the State to prove that Blankenship's plywood was "treated" without testing it.

We need not wade into the deep waters of the marihuana–hemp distinction here because marihuana and treated lumber are not analogous.  Marihuana and hemp have statutory definitions that distinguish them from one another based on their

---

extratextual factors when the statutes in question are *not* ambiguous, [but] such an invitation should be declined").

[16]Blankenship lodges a similar argument regarding the need for testing to determine if a given item is "chemical waste."  We need not address this argument because we dispose of the "chemical wastes" issue on sufficiency grounds.  *See* Tex. R. App. P. 47.1.

17

chemical compositions and that provide standards against which the substances may be scientifically tested. *See* Tex. Agric. Code Ann. § 121.001; Tex. Health & Safety Code Ann. § 481.002(26). As we have already noted, "treated lumber" has no statutory definition, nor does "untreated lumber." Furthermore, Blankenship does not dispute that there were adhesive substances in his plywood—he disputes whether such substances qualify as "treat[ments]." It is unclear how or why a scientific test of the plywood would have changed this.

Based on the evidence presented at trial, and even without a scientific test, a reasonable factfinder could have concluded that Blankenship's plywood had been "treated" within the plain meaning of that phrase.[17] *See* Tex. Water Code Ann. § 7.187(b)(2)(A)(ii); 30 Tex. Admin. Code § 111.219(7) (2022) (Tex. Comm'n on Env't Quality, General Requirements for Allowable Outdoor Burning). An outdoor burn, even if otherwise authorized, may not include "treated lumber." 30 Tex. Admin. Code § 111.219(7) (2022) (Tex. Comm'n on Env't Quality, General Requirements for

---

[17]Blankenship also argues that, because the State could not prove that the plywood was "treated lumber" or that there were any other prohibited items in the fire, it could only prove that the fire contained prohibited substances by relying on Sergeant Lane's testimony regarding black smoke—i.e., his testimony that black smoke indicates that a fire contains toxic or illegal materials. Blankenship labels this testimony "junk science" and argues that the State's reliance upon it necessitates reversal "as a matter of public policy." Even without Sergeant Lane's testimony regarding black smoke, we hold that the State offered sufficient evidence that the plywood was "treated." Thus, we need not address this issue. Tex. R. App. P. 47.1.

18

Allowable Outdoor Burning). There was thus sufficient evidence that the plywood Blankenship admitted burning was a prohibited item.

### b. Insufficient Evidence of "Chemical Wastes"

The unlawful burning of "treated lumber" is a Class C offense for first-time offenders, though, and Blankenship's unlawful burning offense was enhanced to a Class A. The State supports the enhancement by arguing that the same adhesive "treat[ments]" that make the plywood "treated lumber" also support a finding that it is "chemical waste[]."

But the Water Code distinguishes between "treated lumber" and "chemical wastes," and we must do so as well. *See* Tex. Water Code Ann. § 7.187(b). "[C]hemical waste[]" is a high-severity item, "treated lumber" is a moderate-severity item, and under TCEQ rules, "untreated lumber" is either domestic waste or a low-severity item, depending on the circumstances. *See id.*; 30 Tex. Admin. Code § 111.209(1) (2022) (Tex. Comm'n on Env't Quality, Exception for Disposal Fires). If, as the State argues, the same wood additives that convert plywood from "untreated lumber" into "treated lumber" also make that lumber "chemical waste[]," then it is difficult to imagine what items of "treated lumber" would not qualify as "chemical waste[]." Such an interpretation would render the entire "treated lumber" category superfluous and conflict with our "presum[ption] that . . . the entire statute is intended to be effective." Tex. Gov't Code Ann. § 311.021(2); *see Watkins*, 619 S.W.3d at 272 (reiterating that "we must presume that every word in a statute has been used for a

purpose and that each word, phrase, clause, and sentence should be given effect if reasonably possible"). If the legislature intended to classify all "treated lumber" as "chemical waste[]," it would not have distinguished between the two and prescribed different punishments for their burning.[18]

Put differently, even if the additives that convert a piece of raw wood into "treated lumber" could be classified as "chemical wastes," the legislature's separate categorization of "treated lumber" carves out a "treated lumber" exception to the broader "chemical wastes" rule. Tex. Water Code Ann. § 7.187(b); *see* Tex. Gov't Code Ann. § 311.026(a). The punishment provisions for the two items "deal with the same general subject" and offense—unlawful burning—so to the extent that the "general ['chemical wastes'] provision conflicts with [the] special . . . ['treated lumber'] provision, the provisions shall be construed . . . so that effect is given to both," and "the special or local provision prevails as an exception to the general provision." Tex. Gov't Code Ann. § 311.026; *Cheney v. State*, 755 S.W.2d 123, 126 (Tex. Crim. App. 1988) (quoting 53 Tex. Jur. 2d *Statutes* § 186, regarding the rule of *in pari materia* and its application to conflicting statutes that "deal with the same general subject" or "have the same general purpose").

---

[18] The State also argues that "[b]ased on guidance from the TCEQ, plywood could be considered both treated wood and chemical waste." But an agency construction cannot be used to create an ambiguity in an otherwise unambiguous statute. *Cf. Boykin*, 818 S.W.2d at 785–86 (noting that administrative interpretations of a statute should be referenced only if the plain language is ambiguous or would lead to an absurd result).

This is not to say that "treated lumber" could never qualify as "chemical waste[]." It might be possible to modify raw wood using both a wood treatment and a superfluous non-treatment chemical such that it produces a potential air contaminant as an unwanted byproduct. *See Waste*, Webster's Third New International Dictionary 2580 (2002) (defining "waste" as, among other things, "damaged, defective, or superfluous material produced during or left over from a manufacturing process or industrial operation"); *Waste*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/waste (last visited July 7, 2022) (defining "waste" as, among other things, "unwanted by-product of a manufacturing process, chemical laboratory, or nuclear reactor," as in "toxic waste" or "hazardous waste"); *cf. Rhine*, 297 S.W.3d at 312 (holding that "materials, other than plant growth, that produce air contaminants when burned are what is meant by 'waste'" in the enabling provision of Section 382.018(a) of the Clean Air Act). But there is no evidence of that here, and the State does not claim that there is. Apart from the evidence of the plywood's "treat[ment]"—the adhesives holding it together—the State did not offer and has not pointed to any evidence demonstrating that Blankenship's plywood contained superfluous chemicals or unwanted chemical byproducts. A reasonable factfinder could not have found beyond a reasonable doubt that the "treated wood" Blankenship was charged with burning qualified as high-severity "chemical waste[]."

21

Having determined that there is insufficient evidence that any of the three items listed in Blankenship's information—soda cans, bottles, or treated wood—are "chemical wastes," and because the "chemical wastes" category was the State's sole argument in support of Blankenship's high-severity classification, there is insufficient evidence to support Blankenship's Class A enhancement. We overrule Blankenship's first issue.

## D. Location of Burned Items

Next, Blankenship disputes whether the allegedly burned items were actually located in the fire. He argues that the State relied on the officers' testimony to prove the burned items' locations but that the video and photographic evidence directly contradicts the officers' testimony by showing that many of the allegedly burned items—everything other than the plywood—were *adjacent* to the fire. According to Blankenship, the video presents "indisputable visual evidence contradicting the essential portions of [the officers'] testimony" as in *Carmouche v. State.* 10 S.W.3d 323, 332 (Tex. Crim. App. 2000).

In *Carmouche*, the defendant disputed whether he had consented to a search, and the body-camera footage revealed a materially different series of events than those that the officer testified had transpired. *Id.* at 331–32. The officer testified that he "asked [the defendant] if [he] could search him," and the defendant "threw his hands up, said, '[a]ll right[,]' [t]urned around, [and] put his hands on the car" before the officer began the search. *Id.* at 331. The body-camera footage revealed that, in

22

actuality, the defendant "turned around and assumed a position to facilitate the search [only] after he was ordered to do so by one of the [other on-scene] officers," and that the request to conduct a search was "made *as* [the officer] [wa]s reaching for the crotch area of [the defendant's] pants." *Id.* at 332. In "the unique circumstances of [that] case," the Court of Criminal Appeals "decline[d] to give 'almost total deference' to the trial court's implicit [fact]findings" as it normally would have. *Id.* In doing so, the Court noted that "the nature of the evidence presented in the videotape d[id] not pivot on an evaluation of credibility and demeanor" but instead "present[ed] indisputable visual evidence contradicting essential portions of [the officer's] testimony."[19] *Id.* (internal quotation marks omitted).

In contrast to *Carmouche*, the nature of the evidence presented in Blankenship's case *does* "pivot on an evaluation of credibility and demeanor." *Id.* (internal quotation marks omitted). Sergeant Lane expressly stated that "[t]he video d[id] not depict exactly what [he was] looking at," and the body-cameras videos are not so crystal clear as to "indisputabl[y] . . . contradict" this statement. *Id.* Although Blankenship's fire can be seen in the videos, the items in the fire are difficult to detect due to the quality of the videos, the size of the video frames, the lighting and background, and the officers' distance from the fire. Even when the officers approach the fire, the items in

---

[19]In explaining its departure from the general rule requiring "almost total deference," the Court of Criminal Appeals also noted that the trial court seemed to predicate its erroneous decision on a finding of probable cause rather than on a finding of consent. *Carmouche*, 10 S.W.3d at 332.

it are often obscured by the officers' movements, and the number of close-up forward-facing shots of the fire are limited. Indeed, Blankenship's trial counsel himself acknowledged the less-than-perfect nature of the video; while cross-examining the officers, counsel acknowledged that "the video[ is] a little blurry"; he referred to items shown in the video as "[w]hatever that is"; and he stated that "the only thing that you can see in the fire is some wood and I'll be honest[,] I can't tell where the wood is" based on the video. Even Blankenship's expert testified that he could not tell from the videos whether the area around the fire included soda cans or bottles.

The lens of a human eye is different from the lens of a camera. Depending upon the sophistication of the camera lens, the human lens may see more or less detail than the lens of a camera would provide. Thus, while the videos do not "directly corroborate [the officers'] testimony, the video[s] do[] not directly disprove or contradict [their] testimony either." *Villalta v. State*, No. 13-18-00180-CR, 2019 WL 1716824, at *3 (Tex. App.—Corpus Christi–Edinburg Apr. 18, 2019, no pet.) (mem. op., not designated for publication) (rejecting argument similar to Blankenship's and distinguishing *Carmouche* where appellant alleged that dashcam video showed he was not committing any traffic violations). The factfinder was faced with a credibility determination: whether to believe the officers' testimony that they could see items in the fire that were not clearly captured in the body-camera videos. *Cf. id.* (holding that "[t]he trial court could have reasonably credited [the officer's] testimony over the video recording"); *Winward v. State*, No. 09-17-00149-CR, 2019 WL

575954, at *3 (Tex. App.—Beaumont Feb. 13, 2019, pet. ref'd) (mem. op., not designated for publication) (rejecting argument that dashcam recording contradicted officer's testimony regarding reckless driving and holding that, "[b]ecause the [officer] was in a position in the patrol car that differed from the camera's, the trial court could have reasonably resolved any discrepancies between the recording and the [officer's] testimony by concluding that [the officer] could see oncoming traffic better from his position in the car"). "[A]s a general rule, the appellate courts, including this [c]ourt, should give almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's findings are based on an evaluation of credibility and demeanor." *Carmouche*, 10 S.W.3d at 332 (quoting *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997)). The record supports the trial court's decision to believe the officers' testimony, and we defer to that decision. We overrule Blankenship's second issue.

## E. Disproving Statutory Exceptions

Finally, Blankenship argues that there was insufficient evidence that his fire was not authorized under any of the potentially relevant statutory exceptions.

To prove a criminal offense, "[t]he State must negate the existence of any exception to an offense . . . and the negation of an exception to the offense is an element of the offense." *State v. Laird*, 208 S.W.3d 667, 671 (Tex. App.—Fort Worth 2006, no pet.); *see* Tex. Penal Code Ann. §§ 1.07(a)(22)(D), 2.02(b). There are a number of exceptions to the general prohibition on outdoor burning, and

25

Blankenship raises one in particular: the exception authorizing recreational fires. *See* 30 Tex. Admin. Code § 111.207 (2022) (Tex. Comm'n on Env't Quality, Exception for Fires Used for Recreation, Ceremony, Cooking, and Warmth); *see also, e.g., id.* § 111.205 (2022) (Tex. Comm'n on Env't Quality, Exception for Fire Training); *id.* § 111.209 (2022) (Tex. Comm'n on Env't Quality, Exception for Disposal Fires); *id.* § 111.213 (2022) (Tex. Comm'n on Env't Quality, Exception for Hydrocarbon Burning); *Rhine*, 297 S.W.3d at 308 (noting and listing exceptions).

But "[e]ven if [Blankenship's] outdoor burning [was] in fact approved or fell within an exception, there are still other restrictions," including a TCEQ rule which "provides that certain materials may not be burned, despite being otherwise allowable." *Rhine*, 297 S.W.3d at 308–09. Blankenship's information alleged that he violated this TCEQ rule. And "[t]reated lumber" is one of the materials that the rule prohibits burning even if a fire is otherwise allowable as a recreational fire. 30 Tex. Admin. Code § 111.219(7) (2022) (Tex. Comm'n on Env't Quality, General Requirements for Allowable Outdoor Burning); *see id.* § 111.207 (2022) (Tex. Comm'n on Env't Quality, Exception for Fires Used for Recreation, Ceremony, Cooking, and Warmth) (recognizing that recreational fires "shall be subject to the requirements of § 111.219(7)"). By offering sufficient evidence that Blankenship was burning "treated lumber," then, the State provided sufficient evidence that his fire was not authorized under the potentially applicable exception. We overrule Blankenship's third issue.

26

### III. Conclusion, Reformation, and Remand

As we have held, there is sufficient evidence to allow a reasonable factfinder to conclude that Blankenship committed a Class C offense by unlawfully burning a prohibited item—"treated lumber"—in violation of a TCEQ rule. *See* Tex. Water Code Ann. § 7.187(b)(1), (2); 30 Tex. Admin. Code § 111.219(7) (2022) (Tex. Comm'n on Env't Quality, General Requirements for Allowable Outdoor Burning). As we have also held, though, there is insufficient evidence to support the further conclusion that at least one of the prohibited items burned qualified as "heavy oils, asphaltic materials, potentially explosive materials, or chemical wastes." *See* Tex. Water Code Ann. § 7.187(b)(1), (3)(A). Because in convicting Blankenship of the enhanced Class A offense of unlawful burning, the factfinder necessarily found every element required to convict him of the lesser-included Class C offense of unlawful burning, and because there is sufficient evidence to support a conviction for the Class C offense, we are "authorized—indeed required— . . . [to] reform[] the judgment to reflect a conviction for the lesser-included [Class C] offense." *Thornton v. State*, 425 S.W.3d 289, 300 (Tex. Crim. App. 2014).

We therefore remand the case to the trial court to reform the judgment to reflect a conviction for Class C unlawful burning and to conduct a new punishment hearing.[20] Tex. Code Crim. Proc. art. 44.29; *see Griffin v. State*, 491 S.W.3d 771, 777

---

[20]When a trial court has jurisdiction over the original offense charged—as the Hood County Court at Law unquestionably did over Blankenship's original Class A

(Tex. Crim. App. 2016) (remanding for reformation of judgment from capital murder to murder and for new punishment hearing); *Thornton*, 425 S.W.3d at 307 (remanding for reformation of judgment and for new punishment hearing); *Gaddy v. State*, 433 S.W.3d 128, 131 (Tex. App.—Fort Worth 2014, pet. ref'd) (en banc on remand) (similar); *cf. Winkley v. State*, 123 S.W.3d 707, 714 (Tex. App.—Austin 2003, no pet.) (reforming county court at law judgment from Class B theft to Class C theft and remanding for new punishment hearing); *Colquitt v. State*, 650 S.W.2d 128, 129 (Tex. App.—Houston [14th Dist.] 1983, no pet.) (reforming district court judgment from felony to Class C misdemeanor and remanding for new punishment hearing).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Publish
Tex. R. App. P. 47.2(b), 47.4(a)

Delivered: July 14, 2022

---

unlawful burning charge—the trial court retains its jurisdiction even if the evidence at trial shows the offense to be of a jurisdictionally significant lesser grade. *Cf. Ex parte Sparks*, 206 S.W.3d 680, 682 (Tex. Crim. App. 2006) (orig. proceeding) (explaining that "[t]he very reason for the district court to have jurisdiction of misdemeanor offenses that are included in the felony offense is that the evidence might prove the misdemeanor without proving the felony"). "The presentment of an indictment or information to a court invests the court with jurisdiction of the cause," Tex. Const. art. V, § 12(b), and having acquired jurisdiction over the case, the trial court "retains jurisdiction of the case to its final determination." *Bruce v. State*, 419 S.W.2d 646, 646–47 (Tex. Crim. App. 1967) (applying rule where defendant was charged with felony but pleaded to misdemeanor); *see Trejo v. State*, 280 S.W.3d 258, 261 (Tex. Crim. App. 2009) (quoting *Bruce*).